1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                        **DISTRICT OF NEVADA**

8

William Farran, Jr.,                          Case No.: 2:11-cv-961-JAD-CHW

9

10              Plaintiff,

11                    v.                       **Order Granting Defendant's Motion for
                                               Summary Judgment [Doc. 18]**
First Transit, Inc.,

12

13              Defendant.

14

15          This is an employment discrimination case brought under the Americans with Disabilities Act

16   and Nevada state law.  Plaintiff William Farran, Jr. was a bus mechanic for First Transit, Inc., who

17   was injured on the job in 2008, preventing him for various lengths of time from performing his

18   essential job functions.  Farran spent the majority of 2010 on leave, and when he left in October 2010

19   for two surgeries—one related to his on-the-job injury and one not—his leave ran out.  First Transit

20   gave him nearly a month of additional, unpaid leave but insisted he return to full duty on November

21   15th, 2010—the return-to-work date set by the physician performing the surgery related to his on-the-

22   job injury.  Farran neither responded to First Transit's return demand nor returned to work on that

23   date, and his employment was terminated.

24          Farran sued First Transit for employment discrimination, claiming that First Transit

25   failed to reasonably accommodate his disability and discriminated against him on account of it, and

26   that he was fired for filing the disability claim two-and-a-half years earlier.[1]  First Transit now moves

27   _____

28          [1] Farran originally asserted an age discrimination claim against First Transit, for which Defendants
      also sought summary judgment.  The parties subsequently stipulated to dismiss that claim.  Doc. 22.

1  for summary judgment on these remaining causes of action, citing primarily the absence of evidence

2  to support Farran's theories.  Doc. 18.  For the reasons set forth below, the Court grants First

3  Transit's Motion and enters summary judgment on all remaining claims in favor of the employer.

4  **Background**

5  Farran worked for First Transit from 2007 through his termination in November 2010.  His

6  job as a bus mechanic was physically demanding; mechanics are required to regularly lift up to 50

7  pounds, lift up to 65 pounds, and push up to 75 pounds.  Doc. 18-1 at 1.  In June 2008, Farran was

8  injured on the job and rendered temporarily unable to perform his job duties.  Doc. 18-2 at 22.  He

9  filed a workers' compensation claim in connection with this injury, and First Transit moved Farran

10  into a light-duty "transitional" position for nearly six months—twice as long as First Transit

11  generally allows.  Doc. 18-1 at 8 ¶ 13.  At the end of that time, Farran had not been released by his

12  physician to return to work without physical restrictions that prevented him from performing his pre-

13  injury job, so First Transit placed him on workers' compensation/FMLA leave from December 6,

14  2008, through March 15, 2009.  *Id.* at 8 ¶¶ 14-15.  His available leave exhausted and doctor-cleared

15  to return to full duty, Farran returned to work in March 2009, but in July 2009, he again took

16  leave—this time for a neck surgery related to his workers' compensation injury.  Doc. 23 at 6.  Farran

17  was again released to perform his job without restrictions in November 2009.  Doc. 18-1 at 8 ¶¶ 19-

18  20.

19  During the Spring of 2010, Farran's condition worsened, and in April 2010 he requested

20  intermittent leave under the FMLA.  Doc. 18-3 at 4-6.  First Transit did not grant Farran's request for

21  intermittent leave and informed Farran that he would have to provide a note from his treating

22  physician that he was cleared for return to work without restrictions.  Doc. 18-2 at 29-31.  On April

23  20, 2010, Farran's doctor provided a note that Farran was "unable to stand or sit for long periods of

24  time."  Doc. 18-3 at 5.  First Transit approved Farran's FMLA leave on April 26, 2010.  *Id.* at 10.  On

25  May 11, 2010, Farran provided First Transit with a note from his doctor that stated that his physical

26  condition had worsened and he was unable to work without restrictions.  *Id.*

27  By July 21, 2010, Farran had exhausted his FMLA leave, but First Transit extended him an

28  additional 30 days of unpaid leave, "[s]ince the company is aware your condition exists."  *Id.* at 12.

1   Farran returned to work without restrictions on August 17, 2010; nine days later, on August 26, 2010,

2   First Transit permitted him to have another injury-related surgery on his back, and granted him

3   another unpaid leave of absence beginning on October 12, 2010.  Doc. 18-1 at 8.  On that date,

4   Farran's doctor provided a "certification of disability" stating that Farran would be "totally

5   temporarily disabled" from October 15, 2010, to November 15, 2010.  Doc. 18-3 at 18.  Farran had

6   the surgery on October 15, 2010.  *Id.* at 20.

7        On October 27, 2010, First Transit advised Farran "that as of Tuesday, October 12, 2010," he

8   had "exhausted [his] entitlements to FMLA and Personal Leave Requests" under his collective

9   bargaining agreement.  However, as he had "provided the Company with a Return to Work Date of

10  November 15, 2010, the Company [wa]s willing to grant [him] additional Personal Leave time until

11  that date."  Doc. 18-2 at 22-23.  First Transit warned, "If you are unable to return to full duty, no

12  restrictions, on November 15, 2010, the Company will proceed with terminating your employment as

13  no additional leave time will be granted."  *Id.*  The letter concluded, "Should you have any questions

14  or concerns regarding this letter, please do not hesitate to contact me."  *Id.* (punctuation in original).

15  Farran does not dispute that he never personally responded to this letter.

16       In early November, still on leave, Farran decided to have a hip replacement surgery unrelated

17  to his 2008 workplace injury.  Doc. 18-2 at 15.  On November 9, 2010, First Transit mailed Farran

18  another letter outlining his leave history, assessing that he had "far exceeded all applicable leave

19  entitlement,"[2] and closing with, "[i]n the event you do not agree with the information provided,

20  please contact the location Safety Manager or feel free to contact me at [number redacted] to discuss

21  within 3 days of your receipt.  In the event that you do not contact one of us within 3 days of your

22  receipt, it will be determined that you agree with the information provided."  *Id.*

23       Farran did not respond, but the next day a Union representative faxed a response, pleading for

24  additional leave for Farran and suggesting that "The Union has received positive feedback as to

25  [Farran's] ability to return to work without restrictions in several weeks.  Due to this credible

26  recommendation, I feel that First Transit will have a talented mechanic back in their employ within a

27

28  _____

        [2] The specific leave amounts detailed in First Transit's letter are not disputed.

Page 3 of 15

1  short amount of time." Doc. 18-3 at 35. The Union requested "that Mr. Farran be given a Medical
2  Leave of Absence to January 10, 2011. At that time, Mr. Farran would be required to return to work
3  unrestricted full-duty. To the extent he needs further time to recover from this disability or does not
4  have documentation stating he can return to full-duty without restrictions, the Union would
5  understand any recourse the Company would take on January 10, 2011." *Id.* The Union did not offer
6  any medical support for its "positive feedback" assessment.

7      First Transit was apparently unpersuaded by the Union's correspondence. On November 24,
8  2010, when Farran had not returned to work, First Transit wrote to Farran, "[s]ince you were unable to
9  return to work on November 15, 2010, the Company has terminated your employment." Doc. 18-3 at
10 37. Farran grieved his termination and continued to see his doctor. *Id.* at 39-50, 63. When the
11 Union's predicted return date of January 10, 2011, arrived, Farran remained totally temporarily
12 disabled. *Id.* at 39-41. On June 12, 2011, Farran filed this lawsuit. He remained medically uncleared
13 to return to work without restrictions until September 9, 2011. Doc. 18-3 at 52-61.

14                                  **Discussion**

15     Summary judgment is appropriate when "the pleadings, depositions, answers to
16 interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine
17 issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See*
18 *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). When considering
19 the propriety of summary judgment, the court views all facts and draws all inferences in the light
20 most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d
21 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on the material facts at issue, summary
22 judgment is not appropriate because the purpose of summary judgment is to avoid unnecessary trials
23 when the facts are undisputed. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *Nw.*
24 *Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

25     Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of
26 material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts
27 showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256
28 (1986); *Celotex*, 477 U.S. at 323. The nonmoving party "must do more than simply show that there is

1   some metaphysical doubt as to the material facts," *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir.

2   2002) (internal citations omitted); he "must produce specific evidence, through affidavits or

3   admissible discovery material, to show that" there is a sufficient evidentiary basis on which a

4   reasonable fact finder could find in his favor. *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th

5   Cir. 1991); *Anderson,* 477 U.S. at 248-49. The Ninth Circuit has cautioned that courts should require

6   very little evidence to deny summary judgment motions in the employment discrimination context, as

7   the merits of such disputes are properly reserved for the fact-finder. *See Schnidrig v. Columbia*

8   *Machine, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).

9          An employee's response to a motion for summary judgment in the employment discrimination

10   context is subject to the burden-shifting analysis from *McDonnell-Douglas Corp. v. Green* and its

11   progeny. 411 U.S. 792, 802 (1973). "Although intermediate evidentiary burdens shift back and forth

12   under this framework, the ultimate burden of persuading the trier of fact that the defendant

13   intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v.*

14   *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

15   "The facts necessarily will vary in [employment discrimination] cases, and the specification above of

16   the *prima facie* proof required from respondent is not necessarily applicable in every respect to

17   different factual situations." *McDonnell*, 411 U.S. at 802 n.13 (italics added).

18          *McDonnell-Douglas Corp. v. Green* analysis involves a three-step process, the first of which

19   requires the employee to establish a *prima facie* case of discrimination. 411 U.S. 792, 802 (1973);

20   *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-52 (2003) (applying *McDonnell-Douglas* standard to

21   ADA claim). "Establishment of a *prima facie* case in effect creates a presumption that the employer

22   unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*,

23   450 U.S. 248, 254 (1981). The standard for establishing a *prima facie* case of disparate treatment is

24   not onerous, and need only "give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S.

25   at 248. "As a general matter, the plaintiff in an employment discrimination action need produce very

26   little evidence in order to overcome an employer's motion for summary judgment." *Chuang v.*

27   *University of California, Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). This "minimal" burden

28   does not even rise to the level of a preponderance of the evidence. *Wallis v. J.R. Simplot Co.*, 26 F.3d

1  885, 889 (9th Cir. 1994).

2  **A.      Americans with Disabilities Act**

3        The ADA prohibits discrimination "against a qualified individual on the basis of disability in

4  regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."

5  42 U.S.C. § 12112(a).  Such discrimination includes a failure to make "reasonable accommodations

6  to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the

7  employer] can demonstrate that the accommodation would impose an undue hardship on the

8  operation of [its] business."  *Id.* at § 12112(a)(1)(A); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 395

9  (2002).  Thus, to analyze claims of employment discrimination against the disabled, a court first

10  determines if the individual is "otherwise qualified," to perform the essential functions of the job, and

11  if not, whether the employee could perform these functions with a reasonable accommodation.  42

12  U.S.C. § 12111(8); *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 n.17 (1987).

13        "Reasonable accommodations" are defined as, *inter alia*, "[m]odifications or adjustments that

14  enable a covered entity's employee with a disability to enjoy equal benefits and privileges of

15  employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R.

16  § 1630.2(o)(iii).  "The reasonableness of an accommodation is ordinarily a question of fact."  *Lujan v.*

17  *Pacific Maritime Association*, 165 F.3d 738, 743 (9th Cir. 1999).  "[T]he ADA does not impose a

18  duty to create a new position to accommodate a disabled employee."  *Wellington v. Lyon County*

19  *School District*, 187 F.3d 1150, 1155 (9th Cir. 1999).

20        To state a *prima facie* failure-to-accommodate claim, Farran must demonstrate that "(1) he is

21  a disabled person within the meaning of the statute; (2) he is qualified, with or without reasonable

22  accommodation, to perform the essential functions of the job he holds or seeks; and (3) he suffered an

23  adverse employment action because of his disability."  *Braunling v. Countrywide Home Loans Inc.*,

24  220 F.3d 1154, 1156 (9th Cir. 2000).[3]

25

26

27        [3] The parties do not dispute that Farran's original injury was sustained during the course and scope of
his employment, or that he was entitled to request at least some disability leave as a result of that injury.  The

28  parties also agree that Farran's his discharge qualifies as an adverse employment action.

1.   ***Farran Was Responsible for the Breakdown in the Interactive Process Because He Never Submitted Medical Evidence.***

First Transit argues that it provided Farran with numerous accommodations between 2008 and 2010, and that ultimately Farran was responsible for the breakdown in the good faith interactive process because neither he nor his Union provided medical documentation supporting his entitlement to leave beyond November 15, 2010. *See* Doc. 18 at 14-15. First Transit argues that, without a firm return date, Farran's request must be viewed as a request for "indefinite" leave, which an employer need not accommodate under the ADA. *Id.* at 15-16. First Transit highlights the undisputed fact that Farran was not released to full duty until September 2011. *Id.* at 9. Farran responds that First Transit was responsible for the breakdown in the interactive process because they "forced" him to use up his FMLA leave. Doc. 23 at 12-13. Moreover, Farran contends that First Transit's October 27, 2010 and November 9, 2010 letters show that it was "well aware" of Farran's need for an extension of his medical leave. *Id.* at 14. Farran concludes that First Transit's statement that it would terminate Farran's employment on November 15, 2010 "hardly represents an employer trying in good faith to find a reasonable accommodation to enable an employee to continue their employment." *Id.* at 15.

"In general . . . it is the responsibility of the individual to inform the employer that an accommodation is needed." 29 C.F.R. § 1630.9, App.; *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th Cir. 1997) (finding that employee failed to request reasonable accommodation after injury, even though employer knew of the injury).[4] "An employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment due to a medical condition." *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (internal quotation marks omitted). "[O]nce an employee requests an accommodation . . ., the employer must engage in an interactive process with the employee to

---

[4] Persuasive authority has noted that "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation . . . may also be acting in bad faith." *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). This initial duty is in place "because the employee is in the best position to know the extent of his limitations and the scope of the requisite accommodations." *Amato v. St. Luke's Episcopal Hospital*, 987 F. Supp. 523, 532 (S.D. Tex. 1997). Put simply, "the employee cannot expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994).

1  determine the appropriate reasonable accommodation." *Id.*  This requires "(1) direct communication

2  between the employer and the employee to explore in good faith the possible accommodations; (2)

3  consideration of the employee's request; and (3) offering an accommodation that is reasonable and

4  effective." *Id.* (citations omitted).

5          Once initiated, the accommodation process is designed to be an enterprise in "cooperative

6  problem-solving," and is thus a continuing duty which may not be exhausted by one effort.

7  *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).  This good-faith

8  process prohibits either side from delaying or obstructing the process.  *Barnett v. U.S. Airways*, 228

9  F.3d 1105, 1114 (9th Cir. 2000); *Allen v. Pacific Bell*, 348 F.3d 1113, 1114-15 (9th Cir. 2003)

10 (finding that where employee failed to submit medical forms demonstrating improvement in medical

11 condition, employer was not required to accept employee's unsubstantiated statements regarding his

12 medical condition).  Thus, an employer incurs liability for failing to reasonably accommodate an

13 employee only where it is responsible for the breakdown in the communications process.  *See*

14 *Zivkovic*, 302 F.3d at 1089.

15         Farran's contention that First Transit's decision to provide him with 30 days' leave for his

16 October 15, 2010, surgery was "unilateral" is belied by the undisputed evidence.  First Transit's

17 October 27, 2010, letter, the authenticity of which is not questioned, granted Farran's request for

18 leave until November 15, 2010, "as [Farran had] provided the Company with a Return to Work Date

19 of November 15, 2010."  Doc. 18-3 at 22-23.  This is supported by a "certification of disability"

20 stating that Farran would be "totally temporarily disabled" from October 15, 2010 to November 15,

21 2010.  *Id.* at 18.  Thus, to the degree that Farran's leave dates were arrived at "unilaterally," it was

22 Farran who proposed them; First Transit merely accepted them—hardly the type of heavy-handed

23 bargaining that would suggest to the Court that First Transit was abusing the interactive process.

24 Similarly, there is no evidence that First Transit cleverly "forced" Farran to use up all of his FMLA

25 so that it could ultimately take advantage of him when he was later in a vulnerable situation.  It defies

26 logic that the company would subsequently extend Farran unpaid leave if this were its nefarious goal.

27

28         Farran also argues that First Transit simply refused to interact with him.  Doc. 23 at 16.  This

contention, too, is belied by the undisputed evidence.  The letters that First Transit sent Farran on October 27, 2010, November 9, 2010, and November 24, 2010, all asked Farran to contact First Transit with any questions he had regarding the contents of the each letter.  Doc. 18-3 at 22-23, 31, 37.  Farran never responded to any of these letters. Even assuming *arguendo* that Farran's Union was authorized to speak on Farran's behalf, its November 9, 2010, letter to First Transit was not supported by any medical evidence and stated only that the Union "has received positive feedback as to [Farran's] ability to return to work without restrictions in several weeks."  Doc. 18-3 at 35.  First Transit was not obligated to accept this unsubstantiated assertion that Farran was able to return to work.  *See Allen*, 348 F.3d at 1114-15; *cf. Leonel v. American Airlines, Inc.*, 400 F.3d 702, 709 (9th Cir. 2005) (noting that in making hiring decisions, "[t]he ADA recognizes that employers may need to conduct medical examinations to determine if an applicant can perform certain jobs effectively and safely.").  And, indeed, in light of the fact that the feedback underestimated the length of Farran's leave need by nearly nine months, hindsight validates First Transit's decision not to rely on it.

Finally, Farran's argument that First Transit was "well aware" of Farran's continuing need for a reasonable accommodation is not consistent with the evidence.  Although First Transit admitted in its July 21, 2010 correspondence to Farran that it was "aware [Farran's] condition exists," Doc. 18-3 at 12, Farran's leave request beginning October 12, 2010 pertained to a separate surgery.  Farran's prior requests for leave had been accompanied by actual evidence from Farran's medical providers.  There is no evidence that Farran or his Union submitted any additional medical documentation of his condition to support his proposed leave extension until January 10, 2011, following his October 15, 2010 surgery.  Farran fails to explain the absence of such evidence.

In sum, there is no "reasonable inference" to be drawn in Farran's favor because he never provided enough information to First Transit to allow it to determine whether Farran was entitled to an extension of medical leave beyond November 15, 2010.  No genuine issue of fact stands between this Court and the legal conclusion that it was Farran who was responsible for the breakdown in the good-faith communication process.  Thus, Farran cannot establish that First Transit failed to "reasonably" accommodate his disability.

1

2
     **2.    *Farran Has Failed to Show That His Request for Additional Leave Was Definite or that His Request Was Reasonable.***

3
     First Transit also contends that because Farran never provided additional medical evidence

4
 supporting his entitlement to leave beyond November 15, 2010, his request is best viewed as one for

5
 "indefinite" leave, which First Transit had no obligation to grant.  Doc. 18 at 15-16.  Farran responds

6
 that there was no reason for First Transit to have concluded this his medical leave request would be

7
 indefinite, as he had gone on three previous leaves, none of which lasted longer than 3.5 months.

8
 Doc. 23 at 17.

9
     An employer need provide only "some reasonable accommodation" and is not obligated to

10
 provide the specific accommodation requested.  *United States Equal Employment Opportunity*

11
 *Commission v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110-11 (9th Cir. 2010).  To show that a

12
 particular request is unreasonable, the employer must demonstrate that the requested relief would

13
 pose an undue hardship.  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999).

14
 Recovery time of an unspecified duration may post an undue hardship, where the employee "cannot

15
 state when and under what conditions he could return to work at all."  *Dark v. Curry County*, 451

16
 F.3d 1078, 1084 (9th Cir. 2006) (finding a leave request was reasonable where employee had

17
 accumulated medical leave time which could have been put toward accommodation).[5]  As one trial

18
 court persuasively summarized, "There are two limits on the bounds of reasonableness for leave of

19
 absence.  The first limit is clear; the employee must provide the employer an estimated date when she

20
 _____

21
     [5] *Dark* noted that where an employee had accumulated sick and medical leave time, and a genuine issue of material fact existed as to whether this accumulated time could be used to facilitate a transition to

22
 new medication, these "particular circumstances" created a genuine issue of material fact.  *See id.*
 This case is distinguishable from *Dark* because Farran had long-since exhausted all of his accumulated leave.

23
 Other circuits have found that in similar circumstances, an employee was not entitled to further accommodation.  *See, e.g.*, *Robert v. Board of County Commissioners of Brown County, Kansas*, 691 F.3d

24
 1211, 1218 (10th Cir. 2012); *Epps v. City of Pine Lawn*, 353 F.3d 588, 592-93 & n.5 (8th Cir. 2003) (noting that employee's "excessive absenteeism" made a reasonable accommodation unavailable); *Walsh v. United*

25
 *Parcel Service*, 201 F.3d 718, 727-28 (6th Cir. 2000) ("[W]hen . . . an employer has already provided substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is

26
 an objectively unreasonable accommodation."); *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) (noting that where a cure for particular medical ailments was uncertain, "a reasonable accommodation does not require the

27
 [employer] to wait indefinitely for [the employee's] medical conditions to be corrected, especially in light of the uncertainty of cure," and that "[r]equiring paid leave in excess of an employee's scheduled amount would

28
 unjustifiably upset the employer's settled budgetary expectations, and thus cannot be considered a reasonable accommodation.").

1    can resume her essential duties. . . . The second is durational.  A leave request must assure an

2    employer that an employee can perform the essential functions of her position in the near future."

3    *Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 460-61 (E.D. Pa. 2005) (citations and

4    quotations omitted).  Farran exceeded these bounds of reasonableness.

5            Farran was undisputably provided with several leaves of absence prior to October 15, 2010.

6    Although Farran had exhausted all of his available FMLA leave by July 21, 2010, First Transit then

7    granted Farran an additional 30 days' leave, and then provided Farran with more than a month to

8    recover from his October 15, 2010, surgery.  While Farran's Union expressed confidence that he

9    would be able to resume his job without restrictions in early January 2011, this opinion was not

10   substantiated by any medical evidence, which Farran had provided in connection with his prior leave

11   requests.  Without such evidence, the Court cannot conclude that the Union's request for additional

12   leave had an actual end date.

13           Farran also argues that First Transit should have overlooked the Union's own unsubstantiated

14   January 10, 2011, return date, assumed that past was prologue, and that the disability in question

15   would have lasted no longer than 3.5 months based on the length of Farran's prior medical leaves.

16   The central problem with such guesswork is that it suggests that an employee may abdicate his or her

17   obligation to participate in the accommodation process once the employee accumulates an historic

18   record of disabilities and leaves.  Such a ruling would itself provide fodder for an employment

19   discrimination suit by treating employees with the same injuries differently, and this Court declines

20   the opportunity to make it here.  *See* 42 U.S.C. § 12112(a)-(b) (including a failure to reasonably

21   accommodate in the definition of "discriminate"); *cf. Weyer v. Twentieth Century Fox Film Corp.*,

22   198 F.3d 1104, 1116 (9th Cir. 2000) (finding that where company's insurance policy enrollment

23   options did not treat all disabilities equally, the policy was lawful as "there is no discrimination . . .

24   where disabled individuals are given the same opportunity as everyone else.").[6]

25

26   _____

27           [6] Although First Transit admitted in its July 21, 2010, correspondence to Farran that it was "aware
     [Farran's] condition exists," Doc. 18-3 at 12,  First Transit's "awareness" of Farran's medical condition

28   extended only to the leave requested for his October 15, 2010 surgery, for which Farran's medical
     documentation promised a return to full duty by a date certain.

1    The other problem with such guesswork in this case is that it turned out to be wrong: Farran

2 was in fact not released to full duty until September 9, 2011, almost nine months after the date

3 proposed by Farran's Union and almost eleven months after Farran originally went on leave.  Even

4 Farran's Union conceded that "[t]o the extent [Farran] needs further time to recover from this

5 disability or does not have documentation stating he can return to full-duty without restrictions, [it]

6 would understand any recourse the Company would take on January 10, 2011."  Doc. 18-3 at 35.

7 Neither party disputes that as of January 10, 2010, Farran had not been released to return to work

8 without restrictions.

9    Farran next argues that a September 9, 2011, return date would have been neither an indefinite

10 nor unreasonable period of time.  Doc. 23 at 17.  But even assuming *arguendo* that Farran is correct

11 and the nine-month period between January 10, 2011, and September 9, 2011, would not have posed

12 an "undue hardship" on First Transit, Farran's argument has a fatal logistical flaw: an employer

13 would not know whether the employee's absence would pose an "undue hardship" until *after* the

14 employee had fully recovered and the need for accommodation ceased to exist.  This wait-and-see

15 method of assessing undue hardship also runs afoul of the reasoning of *Nunes*, which requires

16 assessment of the risks of alternatives *available* to the employer.  *See Nunes*, 164 F.3d at 1247.  It

17 also disregards the Ninth Circuit's recognition that where an employee "cannot state when and under

18 what conditions he could return to work at all," no accommodation need be provided.  *Dark*, 451 F.3d

19 at 1084.  Farran identifies no evidence that as of January 2011 at the latest, he knew when he could

20 return to work and communicated that information to First Transit, and his sworn deposition

21 testimony reveals that as of January 10, 2011, Dr. Elkanich had not released him to full duty.  Doc.

22 23-2 at 7-8.  As there is no disputed issue of whether Farran knew *when* he was expected to return to

23 work, Farran cannot establish that First Transit denied him a reasonable accommodation.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1    In sum, Farran cannot make out a *prima facie* case of discrimination because he cannot show

2  that he participated in good faith in the accommodation process or that it was First Transit who acted

3  unreasonably in the face of a reasonable accommodation request.[7]

4  **B.    ADA - Disability Discrimination**

5    First Transit also moves for summary judgment on Farran's disability discrimination claim.

6  Discrimination and reasonable accommodation claims are analyzed differently. *McGary v. City of*

7  *Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004). To establish a *prima facie* case of discriminatory

8  discharge, Farran must establish that "(1) he suffers from a disability; (2) that he is otherwise

9  qualified to perform the essential functions of employment, with or without a reasonable

10 accommodation; (3) that he has suffered an adverse employment action; and (4) that a causal

11 connection exists between the adverse employment action and the disability." *Hirschorn v. Sizzler*

12 *Restaurants International, Inc.*, 913 F. Supp. 1393, 1398 (D. Nev. 1995). "Unlike a simple failure to

13 accommodate claim, an unlawful discharge claim requires a showing that the employer terminated

14 the employee because of his disability. Often the two claims are, from a practical standpoint, the

15 same." *Humphrey*, 239 F.3d at 1139.

16    First Transit argues that at the time he was discharged, Farran could not perform the essential

17 functions of his job with or without a reasonable accommodation. Doc. 18 at 13. In opposition,

18

19    [7] Even if Farran meets the "permissive" *prima facie* standard and shift the burden, First Transit can

20 articulate a legitimate, non-discriminatory reason for its challenged decision to terminate Farran's
   employment. *See Raytheon*, 540 U.S. at 52-54; *Dark*, 451 F.3d at 1084; *Chuang*, 225 F.3d at 1123-24. First

21 Transit explained in its October 27, 2010, and November 9, 2010, letters that Farran had exhausted his
   original leave, a decision which was upheld in a subsequent arbitration proceeding. Doc. 18-3 at 70-74.

22 Thus, the burden shifts back to Farran to show that First Transit's articulated reason was either a mere pretext
   for engaging in the unlawful conduct, or that the proffered explanation is unworthy of credence. *Burdine*, 450

23 U.S. at 256; *Reeves*, 530 U.S. at 147; *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003). The
   Plaintiff can meet this burden by presenting circumstantial evidence, which must be "specific and

24 substantial." *Coughlan v. American Seafoods Co., LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). "Liability in a
   disparate-treatment case depends on whether the protected trait . . . actually motivated the employer's

25 decision." *Raytheon*, 540 U.S. at 52 (internal quotation marks omitted). Farran argues that First Transit
   "forced" him to use up his FMLA leave in April 2010 by requesting that not take intermittent leave;

26 according to Farran, First Transit "knew" that be would be having a surgery on his back, and thus plotted for
   Farran to exhaust his leave so they could eventually terminate his employment. Doc. 23 at 12-13. This

27 argument is undercut by two points. First, there is no credible basis for concluding that First Transit *knew*
   that Farran planned to take the October 15, 2010 surgery at the time they "forced" him to take his leave.

28 Second, Farran's doctor actually placed Farran on permanent leave from May 11, 2010 until August 17, 2010.
   Farran has failed to raise an inference of pretext in this case.

1  Farran argues that "[t]he fact that First Transit terminated [him] after they refuse[d] to reasonably
2  accommodate him by extending his leave of absence when the need to do so was evident, is made
3  clear when looking at [Farran's] termination letter of November 24th." Doc. 23 at 19.

4      The parties do not contest that at the time Farran was terminated, he could not perform one of
5  the essential functions of his job—extensive physical movement and regularly lifting up to 50 lbs.
6  *See* Doc. 18-1 at 12. Farran's real quarrel is not with his employer's failure to make an
7  accommodation so he could perform his job, but rather that they did not excuse him from having to
8  work at all. As the record makes it clear that Farran was not otherwise qualified to perform the most
9  basic functions of his job, his claim for disability discrimination fails as a matter of law.

10  **C.   Nevada State Law - Retaliation for Filing for Disability Benefits**

11      Finally, First Transit finally moves for summary judgment on Farran's claim that it's
12  termination was in retaliation for his filing of a disability benefits claim. Nevada recognizes a
13  "narrow" exception to the at-will employment rule which provides a cause of action for retaliatory
14  discharge for filing a worker's compensation claim. *Hansen v. Harrah's*, 675 P.2d 394, 397 (Nev.
15  1984). This cause of action is unavailable under a "mixed motive" theory; an employee must prove
16  that the retaliation for the worker's compensation claim was *the* proximate cause of the discharge, not
17  just one of the causes. *Allum v. Valley Bank of Nevada*, 970 P.2d 1062, 1066 (Nev. 1998). The
18  employee has the burden of proving this direct, causal connection by a preponderance of the
19  evidence. *Bailey v. Southwest Gas Co.*, 275 F.3d 1181, 1187 (9th Cir. 2002).

20      Farran contends that he had a hip replacement surgery unrelated to his disability while on his
21  October 12-November 15, 2010, medical leave, and First Transit has not shown that his termination
22  was not based on his disability-related surgery, or "indicate[d] that he would *not* have been
23  terminated if only the back surgery recovery time was considered." Doc. 23 at 20. Farran's
24  employment was not terminated until more than two years after he filed his disability claim. In the
25  interim, he was provided with disability leave on numerous occasions, and he had received a
26  promotion. Moreover, First Transit had a legitimate, non-discriminatory reason for terminating his
27  employment: Farran had exhausted all of his FMLA leave and was not able to return to work without
28  restrictions by either November 15, 2010, or, as it turned out, anytime before September 2011.

1  Farran also grieved his termination decision, and the employer's decision was upheld by the arbitrator
2  because Farran was not entitled to any additional leave under the terms of the Collective Bargaining
3  Agreement.  Farran does not dispute the outcome of his labor grievance.

4      Farran can demonstrate, at best, that First Transit had "mixed motives" for its decision to
5  terminate his employment.  As a matter of law, Farran's claim cannot succeed on this record, and
6  First Transit's Motion for Summary Judgment on this claim is granted.

7                                    **Conclusion**

8      Accordingly, based on the foregoing reasons and with good cause appearing and no reason for
9  delay,

10     It is hereby **ORDERED** that First Transit's Motion for Summary Judgment **[Doc. 18]** is
11 **GRANTED**.  Summary judgment is entered in favor of First Transit on all remaining claims.

12     DATED: February 6, 2014.

13

14                                    _____
15                                    JENNIFER A. DORSEY
                                      UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22

23

24

25

26

27

28